PETER A. BROWER *et al.*

*v.*

ELLIOTT CALLENDER *et al.*

*Filed at Ottawa November 20, 1882.*

1. EVIDENCE—*declarations of grantor not competent after grant.* The declarations of a grantor after making the grant, are incompetent as evidence to prove what the grantor then did, or to impeach the conveyance.

2. DURESS—*what will avoid deed.* Mere vexation and annoyance, leading to the execution and acknowledgment of a conveyance of land in trust for the grantor and his heirs, is not sufficient to establish such duress as to avoid the deed, unless it be further shown that the grantor's mind was in that condition that by reason of such vexation and annoyance a state of insanity was produced, which existed at the time of the execution and acknowledgment.

3. SAME—*estoppel to rely on party's own acts as causing.* A party who induces the owner of land to convey the same in trust, by threatening to have a conservator of the grantor appointed, and instituting proceedings to have the grantor adjudged insane, and dismisses such proceeding upon the

executing of such deed, will be estopped from afterwards avoiding the deed on the ground its execution was procured by duress.

4. TRUST—*remedy for breach of.* The remedy for a breach of trust or a failure to perform his duty by the trustee, is his removal, and the appointing of a new one, and not the setting aside of the deed of trust.

APPEAL from the Circuit Court of Peoria county; the Hon. D. McCULLOCH, Judge, presiding

Mary Oakley filed her bill in equity, in the office of the clerk of the circuit court of Peoria county, on the 14th of December, 1880, in which she alleged that prior to and on the 22d of July, 1879, she was the owner in fee of sundry real estate in said county, worth, then, $10,000, and then renting for $65 per month, and was all she had; that she was then eighty years old, and had five children, all of age, and without means to support her,—one son, Charles, was totally blind, in ill health, and dependent upon her for support, and that he died on January 9, 1880; that on the 22d of July, 1879, she was in poor health, enfeebled by age and care, when some of her children threatened to have her arrested and brought before the county court, and have the use and control of her property taken from her and placed in the hands of a conservator, asserting that they had power by law to do so, and would, immediately, unless she deeded the property to a trustee, and she, apprehensive of such a proceeding, alarmed and mortified, and fearing she would lose all her property thereby, and her support in her old age, and they, seeing her situation, and to force a conservator upon her, declared that one should be immediately appointed to take all of her property from her, unless she conveyed it to such a trustee on terms dictated by them, to do which she tried to avoid; and they had her immediately summoned before the county court to place her property in a conservator's hands, and she was so surrounded, oppressed, alarmed, confused and threatened, that she was forced, against her

will, not comprehending what she was doing, or understanding the contents of the deed she made, to convey all the property, by trust deed, to defendant Callender, without consideration, with power to him to lease, mortgage or sell it, at discretion, for the use of complainant and her son Charles, for their lives, should it even require the whole to be so used, and any residue to be held for and divided between her other children, at her death; that defendant Callender accepted the trust, which was executory and continuing, and that he leased and mortgaged the property, and got the proceeds, and refused to provide for her, and left her to suffer from cold and want, while he kept her property and its proceeds in his own use; that her health was gone, and she was in want of house and home and the comforts of life, which Callender refused to get for her; that her property was not derived by her from her children, and yet Callender kept her in cold and in want, to hold it for his use or for them; that he neglected and refused to perform the trust he undertook to perform, and as she was remediless, she prayed the court to cancel and set aside the trust deed to Callender, require him to account, and surrender to her the title and possession of the property, etc. Summons was issued, and served upon Callender, and the court ordered that he pay complainant $10 per week for her support, *pendente lite,* and until the further order of the court.

Before any further order in the case, and on the 21st day of February, 1881, the complainant Mary Oakley died, having previously made her last will and testament, whereby she gave and devised a part of her property in fee to Peter A. Brower and Margaret B. Brown, and the residue of her property she devised, first, for the payment of her debts; and second, that the remainder, if any, should be equally divided among all her children. She appointed Peter A. Brower and Margaret B. Brown executor and executrix of her last will and testament, who duly qualified as such. Charles Oakley,

her blind son, referred to in the bill, died some time before the death of Mary Oakley. She left surviving her the following named children as her only heirs at law, viz., Peter A. Brower, Margaret B. Brown, Maria Hall, and Marcellus Oakley.

On the 4th of April, 1881, Peter A. Brower and Margaret B. Brown filed in the office of the clerk of the circuit court of Peoria county an amended and supplemental bill, setting up these facts, restating, substantially, the allegations of the original bill, and praying, as in the original bill, that the deed of trust be set aside, and for an account,—making, also, Maria Hall and Marcellus Oakley defendants thereto, and they were duly brought before the court by summons. Elliott Callender answered, alleging a general want of equity in the bill. He admitted the death of Charles Oakley, and of Mary Oakley, leaving heirs as alleged in the bill, and that she made the trust deed to him of the property in controversy without consideration paid by him, and that he had taken possession, and leased and mortgaged a part, and was about to sell it when restrained by the court, and denied generally all other material allegations in the bill; averring his good faith and efforts to carry out the trust, and demurs to the right and prayer for an account, specially and generally. The joint and several answers of Maria Hall and Marcellus Oakley admit the death of Mary Oakley; that she made the trust deed alleged, and left heirs surviving her, as alleged, and generally deny all other material allegations of the bill, and therein demur to the relief prayed. There was a general replication to the answers.

On the 16th of March, 1882, complainants, by leave of court, filed a second amendment to the bill of complaint, alleging that said trust deed was executed by Mary Oakley while under substantial and virtual duress, and that she was then in a disturbed state of mind, from apprehension, annoyance, fear and distress, brought upon her through and by

the proceedings to have her declared insane, and a conservator appointed for her, and her property taken away, which distracted her mind and compelled her to execute the alleged trust deed, to her wrong and injury, whereby it became and was void, and that she and said complainant Margaret B. Brown continued to live on the property in question to the filing of the bill.

The cause was heard at the March term, 1882, of the Peoria circuit court, on bill, amended and supplemental bills, answers and proofs, and the court thereupon found the equities for the defendants, and decreed that the bill be dismissed, etc. This appeal is from that decree, and the errors assigned question the ruling of the court in so decreeing.

Messrs. PRETTYMAN & SONS, for the appellants:

Where one is induced to act through fear, or threats, or of apprehension short of duress, his acts may be avoided. *Inhabitants of Worcester* v. *Eaton*, 11 Mass. 368; 13 id. 371; 1 Story's Eq. Jur. 239.

Here were threats, alarm, misrepresentation and undue influence, exerted wrongfully and fraudulently by a part of those procuring the deed, and through this means the deed of trust was procured, and equity will set it aside as to all parties. *Whelan* v. *Whelan*, 3 Cow. 537; *Brown* v. *Peck*, 2 Wis. 261.

The deed was made under false representation and suppression of facts, and without any consideration. *Gee* v. *Spencer*, 1 Vern. 32.

Concealment of a material fact is sufficient to avoid a release obtained by the person whose duty it was to make the disclosure. (*Brodrick* v. *Brodrick*, 1 P. Wms. 239; 1 Mod. Ch. 208; *James* v. *Graves*, 2 P. Wms. 270.) And this though the trustee is not privy, personally, to the wrong, etc. *Herguenin* v. *Bosely*, 14 Ves. 273; *Bennett* v. *Wade*, 1 Dickens, 84; *Bridgeman* v. *Green*, 2 Ves. 627.

The refusal of the trustee to supply the grantor with the necessaries of life, warrants the inference of an abandonment of the contract by the trustee, and justifies a decree rescinding the contract and canceling the deed. *Jenkins* v. *Jenkins,* 3 Mon. 329; *Frazier* v. *Miller,* 16 Ill. 48; *Oard* v. *Oard,* 59 id. 46; *Henry County* v. *Winnebago Drainage Co.* 52 id. 463; *Whitney* v. *Roberts,* 22 id. 381; *Brake* v. *Johnson,* Prec. in Ch. 142; Roberts on Fraudulent Conveyances, 658.

Messrs. JAMES, JACK & MOORE, for the appellees:

The facts and circumstances of this case fail to show duress, or that undue or improper influence was exercised by Mrs. Brown or Mrs. Hall upon the mind of Mrs. Oakley. Threats of a criminal prosecution, or the payment of money to avoid a criminal prosecution, do not make out a case of duress. *Baldwin* v. *Murphy,* 82 Ill. 485; *Richards* v. *Duncan,* 3 N. H. 508; *Alexander* v. *Pierce,* 10 id. 494; *Knapp* v. *Hyde,* 60 Barb. 82; *Smith* v. *Rawley,* 66 Ind. 502; *Harmon* v. *Harmon,* 61 Me. 227.

A deed made to avoid a threatened suit will not be set aside for duress. *Harris* v. *Lyon,* 24 Pa. St. 347; *Snyder* v. *Braden,* 58 id. 143; *Evans* v. *Gale,* 18 N. H. 397; *Davis* v. *Lester,* 64 Mo. 43; *States* v. *Davis,* 79 N. C. 603; *Landa* v. *Obert,* 45 Texas, 539; *Waller* v. *Gale,* 8 B. Mon. 11; *Miller* v. *Miller,* 68 Pa. St. 486; *Stover* v. *Mitchell,* 45 Ill. 214; *Swanston* v. *Ijams,* 63 id. 165; *Tooker* v. *Sloan,* 30 N. J. Eq. 394.

The undue influence necessary to be shown to set aside a will, is an influence specially directed toward the object of procuring a will in favor of particular parties. *Allmon* v. *Pigg,* 82 Ill. 149; *Roe et al.* v. *Taylor,* 45 id. 491; *Yoe* v. *McCord,* 74 id. 33.

In the following cases, very similar to the one at bar, the deeds were upheld: *Nace* v. *Boyer,* 30 Pa. St. 99; *Greenfield's Estate,* 14 id. 489; *Volk* v. *Turn,* 101 Mass. 494;

*Hildreth* v. *Elliott,* 8 Pick. 293; *Lindsay* v. *Lindsay,* 50 Ill. 79; *Wiley* v. *Ewalt,* 66 id. 26.

The trustee has faithfully executed his trust, but if he had not, the remedy would be the removal of the trustee and the appointment of another, and not the cancellation of the deed.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

The first and principal question arising upon this record is, did Mary Oakley knowingly and voluntarily execute the deed of trust to Elliott Callender? It is contended by counsel for appellants that she was ignorant of the contents of the deed when she signed it, and also that she signed it under duress.

The deed was the joint production of Messrs. Loucks and Hopkins, the first draft being prepared by Loucks and submitted to Hopkins, (who was the attorney of Mary Oakley,) when he made emendations, and then Loucks re-transcribed it. After it was thus perfected, (Loucks testified,) he read it all over to Mrs. Oakley, "and she expressed herself satisfied with it, and that it was just the thing she long wanted. * * * I then left the deed of trust with her, in accordance with my understanding with Mr. Hopkins that he would go there and take the acknowledgment." Again he said: "Mrs. Oakley fully understood and knew the contents of the deed at the time I read it to her. I read it very distinctly and slowly, and explained its bearings, and what the trustee would have a right to do, and after my explanation she said she was perfectly satisfied."

Hopkins, who took the acknowledgment of the deed, says: "She sat down near me, and I read the deed to her, explaining its provisions as I went along. She asked questions from time to time, and occasionally wanted a passage re-read, so as to get a more clear idea of it. I went over the deed, and all its provisions, and made explanations with much more than my usual care and particularity, for two reasons: first,

because I knew, from my long acquaintance with her, that she was unstable-minded, and apt to be dissatisfied with what she had done concerning her property, after it was done; second, because the relatives, questioning her sanity, might thereafter question the validity of the deed. After I had read it to her, and explained to her the meaning and effect of portions of it, and before she signed it, I asked her distinctly whether she understood it all, and she said she did. During the whole transaction I saw nothing to indicate or suggest to my mind that she failed to understand everything there was in the deed, and the effect of it. At this time, however, she was undecided whether to execute the deed or not, and asked my advice. I told her to act on her judgment. * * * I then told her the deed would have no force until delivered, and that she could retain it until she had made up her mind whether she wanted to have it go into force or not, and I left it with her, and left it until the next morning for her to decide, but that same evening she came to my house with the deed, handed it to me, said she had sufficiently considered it, and had determined to execute it. I then took her acknowledgment, and she left it with me, with directions to deliver it to Callender, which I did."

'It is only in the rarest instances where such ample proof of care taken to avoid misapprehension, and to insure a thorough understanding of the terms and effect of the instrument executed, is made. These witnesses, too, are men of high standing in the profession as attorneys at law, both for professional learning and integrity, and there is not the slightest suspicion of a motive for bias or unfairness in their evidence shown by anything before us. The appellant Mrs. Brown, and her daughter, Mrs. Harris, are inclined to contradict, in some respects, the evidence of Hopkins; but they were not in the room, nor even in the house, where Hopkins and Mrs. Oakley were when he read and explained to her the deed of trust. It is true they were in an adjoining

house, and near by, but they heard under difficulties, and their surroundings were all unfavorable. Mrs. Brown was then on unfriendly terms with Mrs. Oakley. She and her daughter, Mrs. Harris, were not invited to be present,—they only knew by guess the purpose of Hopkins' visit. They were, perhaps not unnaturally, in that state of excited feeling where there is great liability to the creation of impressions, purely imaginary, which can not subsequently be separated from those based on facts. Moreover, Mrs. Brown's subsequent interest to have the facts different from those testified to by Hopkins, is to be taken into account. The subsequent declarations made by Mrs. Oakley are incompetent as evidence to prove what she then did. They could, at most, but prove her forgetfulness.

There is no established principle of law which, under the evidence before us, would sanction our holding that the evidence established that Mrs. Oakley did not, knowingly, execute the deed of trust,—assuming, of course, that she was, mentally, capable of comprehending the nature and effect of such an instrument.

In order to clearly understand the question of whether Mrs. Oakley was acting under duress in executing the deed of trust, it is necessary to explain her relationship to the parties to this record, and the circumstances under which she executed the deed of trust, a little more fully than appears from the statement of the case. She had been twice married, and both husbands were long since dead. By her first husband, who was named Brower, she had two children, Peter A. Brower and Margaret B. Brown, these appellants. By her last husband, who was named Oakley, she had, living at the time, three children, Maria Hall and Marcellus Oakley, appellees here, and Charles Oakley, who died since that time, but before the death of Mrs. Oakley. Mrs. Oakley was well advanced in years, (being, as alleged in her bill, eighty years of age,) and of infirm health. Charles was blind, and was

rapidly approaching his death from a pulmonary affection, commonly called consumption. His care and support were objects of deep solicitude to Mrs. Oakley, and professedly so to all the other parties to the record. Mrs. Brown and Mrs. Hall, professing to be alarmed lest Peter A. Brower, who was, as we have seen, the brother of the one and the half brother of the other, should, by his influence with their mother, Mrs. Oakley, procure her to convey her property to him, and thus leave her, in her old age, and the blind and invalid Charles, without the means of support, employed Mr. Loucks to institute proceedings to have a conservator appointed to take charge of the estate of Mrs. Oakley, and accordingly, on the 19th of June, 1877, they signed a petition for that purpose, which was then filed in the office of the clerk of the county court of Peoria county, and a summons was thereupon issued, returnable to the July term of that court, which was served upon Mrs. Oakley on the same day that it was issued, viz., the 19th of June. She executed the deed of trust to Callender on the 22d day of July, 1877, and on the next day, the 23d day of July, the petition filed by Mrs. Brown and Mrs. Hall was dismissed, at their costs.

We think it quite apparent, from the evidence, that the trust deed would not have been executed when it was, if ever, had not the proceedings to appoint a conservator been instituted. But we also think it equally apparent that its execution was the result of Mrs. Oakley's own deliberate and voluntary judgment and choice,—not only as a means of stopping that proceeding, but also of allaying jealousies among her children, and of relieving her of a care in regard to her property that she was physically disqualified to take. The idea of executing the deed of trust seems to have originated with Mrs. Oakley herself. Loucks says: "A few days after Mrs. Oakley had been served with notice, Mr. Brower, her son, who was then staying with the old lady, and taking care of her and Charles, came to my office, and told me that

7—105 ILL.

Mrs. Oakley would like to see me for the purpose of having the proceedings for the appointment of a conservator stopped, and have a trustee appointed instead, and told me that the old lady was perfectly willing to have a trustee appointed. * * * . I then went to see Mrs. Oakley. Upon conversing with her, I found her mind to be in a competent condition to know what she was doing. I then asked her what she wished to see me for. She said, to see if a trustee could not be appointed instead of a conservator. She said she had a trustee once before, during her first husband's lifetime, who managed all her property and business, and she was anxious to have a trustee appointed to take charge of her property, as she began to feel weak and old, and it was a trouble to look after her rents and property, and it worried her to do so; that she had often thought of having a trustee appointed, so that she would be relieved from the burden and care of her property."

That there was no ground, in fact, for appointing a conservator, is conceded on all hands, and, in our opinion, there was no reason why Mrs. Oakley should have seriously believed a conservator would be appointed, nor do we think the proof shows that she did so believe. She consulted her friend, Mr. Puterbaugh, an eminent attorney at law, and told him her troubles. He advised her, in regard to the execution of the trust deed, to do as her counsel thought best. He told her, also, "that if they went ahead with the proceedings for the appointment of a conservator, and Judge Hopkins should not appear for her, to let" him know, and he would appear for her and defend her rights. He says: "She seemed anxious to avoid the proceedings, but, at the same time, she * * * insisted that she was as capable as ever to take care of her own business." Hopkins says: "Was employed to defend that proceeding. I looked up witnesses with a view of showing her capacity and sanity, and advised her that I believed the proof was entirely sufficient for that purpose." At another

time, he says, he told her that if she refused to execute the deed they could not get a conservator appointed. Again he said, on cross-examination: "Mrs. Oakley frequently expressed to me a great deal of solicitude in regard to the proceedings for the appointment of a conservator. She was somewhat nervous upon the subject, and had a good deal of anxiety about it. She never expressed to me an unwillingness to go before the court upon the hearing, but desired that the hearing might be prevented."

There is, undoubtedly, plenty of evidence that Mrs. Oakley was fretted and worried by this proceeding; but this, we think, from a fair consideration of the evidence, was not merely because of the proceeding itself, but because of the conduct of her children in instituting it, and as otherwise manifested. Puterbaugh says: "She stated that the proceedings were instituted by some of her children, and complained bitterly of the treatment she was receiving from them." Mrs. Brown shows, herself, that Mrs. Oakley had, just before that time, refused to live with her, and wanted to be with strangers. She also says: "Up to this time she had managed her own affairs, and it always worried her that she could not do it in her lifetime. Her feelings were very bitter. She did not like it, as she thought her children had done wrong." Hopkins says: "She talked with me about the policy of making the deed. Said that some of her children desired to have the conservator appointed because they were afraid that she would give her property to P. A. Brower, or give him some advantage over the rest; but she did not intend to do that, as he had cost her a great deal already, and went on to specify several instances in which she had to pay money for him, or that he had got her property or obligations in such a way that she had to pay, and she did not intend to do it any more."

After the trust deed had been agreed upon, and before signing, Loucks says Mrs. Oakley "expressed herself per-

fectly satisfied with it, and that it was just the thing she long wanted, and that she had no doubt that Mr. Callender, who had been fixed upon by herself and Judge Hopkins as trustee, would do well by her, as he was handy to her and the property, and now she would be relieved of a great deal of trouble." He adds, moreover: "Mrs. Oakley first suggested to me the ultimate disposition that should be made of her real estate after the termination of the life estate of Mrs. Oakley and Charles, and it was provided for at her instance."

Without undertaking to define with precision what will and what will not constitute such duress as justifies the setting aside of a deed knowingly executed and acknowledged in due form, we are clear the evidence here does not establish such duress. Mere vexation and annoyance are not sufficient for that purpose, unless, indeed, it be shown that the mind was in that condition that by reason of such vexation and annoyance a state of insanity was produced, which existed at the time of the executing and acknowledging of the deed. Without disregarding the evidence of Loucks, which we can not do, the trust deed was a result finally reached by Mrs. Oakley, that met with the approval of her judgment on grounds of personal convenience, as well as on other grounds. It was not the product of her fears,—the result of a paralyzed will,— but of a deliberate and voluntary judgment.

It is not contended that there is anything inequitable in the deed of trust. Assuming, what the proof shows, that by reason of the physical infirmities of Mrs. Oakley some one other than herself was needed to take charge of and manage the property, and in view of its limited capacity for production, it is not perceived why the trusts are not wisely conceived and carefully guarded. The support and care of Mrs. Oakley and of Charles were assured,—not in a stinted or limited manner, but with reasonable liberality; and the disposition of the remainder, after the death of Mrs. Oakley and Charles,

was that which the law itself would have provided,—equality to all of the children.

It is to be noted and considered as of some, though perhaps slight, significance, that this litigation would have died with Mrs. Oakley but for the fact that Mrs. Oakley, in her last sickness, made a will making specific legacies of certain property, conveyed by the deed of trust, in favor of Peter A. Brower and Margaret B. Brown, whom she appointed executor and executrix of such will. This, it is claimed, is based upon a sort of moral equity, originating in the fact that such property was purchased by money belonging to their father. Although not material, it is not clear that this is the fact. Peter A. Brower says certain property was settled upon his mother by an ante-nuptial contract with his father, and that the property willed to him and Mrs. Brown is the proceeds of that property. He does not say whether this property belonged to his father, originally, or whether his mother inherited it or otherwise derived it from some other source, and his father simply, by the ante-nuptial contract, surrendered the right which, at common law, he would, upon marriage, have had to it or to its possession. But, in either event, the property thenceforth was hers. She enjoyed it and preserved it, and it belonged to her as completely as, after she became a widow, her earnings did. She might, it is true, justify herself upon that ground in giving it all to Brower's children; but there was no legal claim in that regard, and the moral claim was rather shadowy and fanciful.

But, we think, under this evidence it does not lie in Margaret B. Brown and Peter A. Brower to say the deed of trust was executed under duress. If the proceedings to appoint a conservator caused duress, who more than Margaret B. Brown is responsible therefor? She joined in the employment of an attorney to institute the proceedings. She joined in signing the petition therefor, and her attorney (Loucks) testified that she furnished the data on which the charge of insanity was

preferred, and she joined in agreeing that when the trust deed was executed the petition should ·be dismissed. It is true she claims in her evidence to have been misled by Mrs. Hall and Marcellus Oakley, but she is not borne out in this by her attorney, and the attendant circumstances, as in proof, do not bear her out. Mrs. Hall and Marcellus Oakley both ·resided in Pekin, while she resided in Peoria, where, also, resided Mrs. Oakley, and until quite recently Mrs. Oakley had been residing with her. While, therefore, they must learn from her or others the condition of Mrs. Oakley's mind, ·she, of her own knowledge, knew what it was. Instead of their being able to inform her, she should have informed them. Loucks says: "I learned most of the facts on which I based my petition for appointment of a conservator, from Mrs. Brown." Again: "I notified Mrs. Hall, Mrs. Brown and Mr. Oakley of the proposition Mrs. Oakley had made,— *i. e.,* to make a deed of trust. They told me that their only object was to have the old lady and Charles properly cared for, if it took all the property to do so; that if it could be done just as well by the appointment of a trustee as a conservator, they would be perfectly satisfied." And again: "Mrs. Brown was perfectly satisfied in having the deed executed." Peter A. Brower was then with Mrs. Oakley, taking care of her. His position,—that of son and chosen protector,—was one demanding of him as a solemn duty to see that she was protected in every respect. He knew her condition, mentally and physically, and her necessities, and means of supplying them, thoroughly; yet he was the bearer of the proposition from her to the attorney of Mrs. Brown and Mrs. Hall to have this deed of trust executed, which he now says was executed under duress, and he gave it his unqualified approval until after it was finally agreed upon and it came to designating the property to go into the deed, and then, for the first time, he objected,—not, however, because she was being

coerced or wronged, but because she was including property he claimed she ought to give to him.

Loucks says, after mentioning that Brower came to him with this proposition from his mother: "As I was leaving the house Mr. Brower followed me out, and wanted to know what we had done. I told him what she wanted in regard to the appointment of a trustee, and that she wanted me to be appointed, and he urged me to take the appointment,—that that would be satisfactory to all." In his evidence before this, while reciting the communication conveyed to him from Mrs. Oakley by Brower, Loucks likewise said, that Brower said "he (Brower) also was perfectly willing that a trustee should be appointed." This witness also shows that when he went to Mrs. Oakley to get a description of the property for the trust deed, Brower assisted in procuring title papers, etc., to obtain the necessary description, until he and his mother got into a dispute about a piece of property in Pekin, which he claimed she should give to him. He demanded a deed for it then, and upon her refusing to make the deed he angrily informed her that he would go back to Pekin, and left the house. If there was duress then, he knew it, and should have prevented it. By his conduct and words he encouraged and aided in the execution of the deed of trust, and it would be inequitable to now allow him to make profit to himself by repudiating and disavowing what he then did.

Some merit is claimed for these appellants on the ground of personal care and attention rendered by them for Mrs. Oakley; but the report of the trustee, and other evidence, shows this was all for a consideration charged and paid, and if, therefore, the amount was not sufficient, the remedy is not through this proceeding.

Upon the point made in the bill that the trustee failed to perform his duty, we deem it sufficient to say the proofs do not sustain the charge. That Mrs. Oakley made frequent

and serious complaints, towards the latter part of her life, is certainly clearly proved, but it is about as well proved that it was not possible to satisfy her. She first could not live with Mrs. Brown, then must go in a strange family, then could not stay there but must go back to Mrs. Brown's, then must go to Brower's, at Pekin, and then, after the novelty of being there wore off, she wanted to be back again at Peoria. Disease that was fast consuming her vitals, made her restless, irritable and suspicious. With the means he had, we see no cause to complain of the conduct of the trustee. But if the trust were valid, the remedy for a breach of trust, or a failure to perform his duty by the trustee, would be simply the removal of the old trustee and the appointing of a new one,—not the setting aside of the deed of trust.

There is evidence given by Brower and by Mrs. Brown, and to some extent by Mrs. Harris, (Mrs. Brown's daughter,) and it may be, also, by others, not in harmony with the conclusions we have expressed. To have quoted and commented on that evidence fully, would have extended this opinion, already much too long, to an unreasonable length. All the evidence has been carefully considered, but that not in harmony with the conclusions we have expressed was not thought to overcome the evidence to which we have alluded.

We see no cause to disturb the decree below, and it is therefore affirmed.

*Decree affirmed.*